Argued and submitted March 8, sentence of death vacated and case remanded to circuit court for further proceedings November 24, 1995, reconsideration denied February 13, 1996

# STATE OF OREGON,
*Respondent,*

*v.*

# RANDY LEE GUZEK,
*Appellant.*

## (CC 87-CR-0373-TM; SC S38455)

906 P2d 272

J. Kevin Hunt, Oregon City, argued the cause on behalf of appellant. With him on the briefs was John P. Daugirda of Roost & Daugirda, Eugene.

Rives Kistler, Assistant Attorney General, Salem, argued the cause on behalf of respondent. With him on the brief were

Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Brenda JP Rocklin, Assistant Attorney General, Salem.

UNIS, J.

Graber, J., dissented and filed an opinion in which Carson, C. J., and Gillette, J., joined.

**UNIS, J.**

This case is before this court on automatic and direct review of defendant's sentence of death. ORS 163.150(1)(g). For the reasons that follow, we vacate defendant's sentence of death.

In 1988, defendant was convicted of two counts of aggravated murder and sentenced to death.[1] On automatic and direct review of that judgment, this court affirmed defendant's convictions, but vacated defendant's sentence on the basis of *State v. Wagner*, 309 Or 5, 14-20, 786 P2d 93, *cert den* 498 US 879 (1990) (*Wagner II*), and remanded the case for a new trial of the penalty phase or, at the election of the district attorney, for a life sentence. *State v. Guzek*, 310 Or 299, 305-06, 797 P2d 1031 (1990) (*Guzek I*).

In 1991, a new jury was empaneled for the penalty phase pursuant to ORS 163.150(5)(a)(B) (1989). Before the jury was empaneled for that penalty proceeding, defendant moved to exclude the introduction of all "victim impact evidence"[2] by the state, contending, among other things, that it:

> "[i]s irrelevant, unduly inflamatory, wholly unrelated to the blameworthiness of this particular defendant, and likely to cause the sentencing decision to turn on irrelevant factors such as the degree to which the victim's family is willing and able to articulate its grief, or the relative worth of the defendant's character;

> "[d]iverts a jury from deciding the case on the relevant evidence and data concerning the crime and defendant; [and]

> "[v]iolates the Eighth and Fourteenth Amendments to the United States Constitution[.]"[3]

---

[1] The facts of this case are set forth in this court's opinion in *State v. Guzek*, 310 Or 299, 797 P2d 1031 (1990) (*Guzek I*).

[2] In this opinion, we use the term "victim impact evidence" to mean evidence presented at the penalty phase on remand relating to the victim's personal characteristics and the emotional impact of the victim's death on the victim's family.

[3] The Eighth Amendment to the Constitution of the United States provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The cruel and unusual punishments clause applies to the states through the due process clause of the Fourteenth Amendment. *Robinson v. California*, 370 US 660, 667, 82 S Ct 1417, 1420-21, 8 L Ed 2d 758, 763 (1962).

The trial court granted defendant's motion. At that time, the Supreme Court of the United States had held that the Eighth Amendment to the United States Constitution barred the admission of victim impact evidence in the penalty phase of capital trials. *Booth v. Maryland*, 482 US 496, 509, 107 S Ct 2529, 2536, 96 L Ed 2d 440, 452 (1987); *South Carolina v. Gathers*, 490 US 805, 811, 109 S Ct 2207, 2211, 104 L Ed 2d 876, 883 (1989).

■ After the new sentencing jury was empaneled, but before opening statements were made, the Supreme Court overruled *Booth* and *Gathers* in *Payne v. Tennessee*, 501 US 808, 111 S Ct 2597, 115 L Ed 2d 720 (1991). In *Payne*, the Supreme Court held that the Eighth Amendment did not erect a *per se* bar to the admission of victim impact evidence. 501 US at 827. Justice O'Connor explained the significance of that holding:

> "We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, 'the Eighth Amendment erects no per se bar.' " *Id.* at 831 (O'Connor, J., concurring) (citations omitted).

Thus, whether victim impact evidence should be admitted during the penalty phase of a capital case is an issue of state law.

Believing that Oregon state law permitted the admission of victim impact evidence, the state timely notified the trial court and defendant that it intended to offer such evidence in this case.

Defendant renewed his objection to the admission of such evidence, arguing that victim impact evidence was not admissible as a matter of Oregon statutory and constitutional law. The trial court overruled defendant's objection, ruling that such evidence is admissible.

During the penalty phase on remand, the state called some family members of the two victims in this case, a husband and wife, to testify. The brother of the husband described that victim's personal characteristics and background. The couple's daughter also described the personal characteristics and background of both victims and the impact of their deaths on the family.

After the conclusion of evidence and closing statements, the trial court instructed the jury:

"You will be given three questions that you must answer yes or no. The State has the burden of proving that the first two questions must be answered yes. The State must prove that that is the appropriate answer beyond a reasonable doubt. If the affirmative of the two questions is not proven beyond a reasonable doubt, the questions should be answered no. Neither party has any burden of proof as to the third question.

"In answering each of the three questions, each may be answered yes only if all twelve jurors agree that that should be the answer. If one or more jurors do not agree to a yes answer to any question, then that question must be answered no. In answering these questions, your answers must be based upon the evidence in this case and upon the Court's instructions. The three questions that will be submitted to you are as follows.

"First, was the conduct of the [d]efendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

"Two, is there a probability that the [d]efendant would commit criminal acts of violence that would constitute a continuing threat to society? In determining the answer to this question, you shall consider any mitigating circumstances offered in evidence including but not limited to the [d]efendant's age, the extent and severity of the [d]efendant's prior criminal conduct, and the extent of the mental and emotional pressure under which the [d]efendant was acting at the time the offense was committed.

*"The third [question] is, should the [d]efendant receive a death sentence? You answer this question no if you find that there is any aspect of the [d]efendant's character or background or any circumstance of the offense that you believe would justify a sentence less than death.*

"* * * * *

"In determining the answers to all three of these questions, you may consider any mitigating circumstances that have been offered in evidence. If you do not unanimously answer all three questions yes, then the [d]efendant will be

sentenced to life imprisonment without possibility of parole for at least 30 years on each count of aggravated murder so that there will be a separate sentence imposed for each verdict you return which has a no answer in it.

"If you do answer all three questions yes as to the death of either victim, the Court will sentence the [d]efendant to death. The burden of proof is on the State to prove beyond a reasonable doubt the yes answer to each of the first two questions submitted to you, and I just told you that. * * *

"And, as I told you, *there is no burden of proof on either party as to the third question. You may consider any aspects of [d]efendant's life in your determination of the third question regarding appropriateness of the death penalty*, and any aspect of [d]efendant's life that may be relevant in your determination in the first two questions. Defendant need not prove the existence of a mitigating circumstance. If you reasonably believe that a mitigating circumstance exists, you may consider it as established." (Emphasis added.)

The jury deliberated and answered each of the three questions in the affirmative. The trial court scheduled sentencing for five days later and at that time pronounced defendant's death sentence.

Defendant raises numerous assignments of error. Defendant first assigns as error the decision of the trial court to admit the victim impact evidence. Defendant makes both statutory and constitutional arguments that the victim impact evidence was not admissible. We begin with defendant's subconstitutional arguments. *See State v. Stevens*, 319 Or 573, 579, 879 P2d 162 (1994) (*Stevens II*) (court decides subconstitutional issues before addressing constitutional issues).

■ Defendant argues that the victim impact evidence was not admissible because it was not relevant to any of the substantive issues submitted by the court to the jury pursuant to ORS 163.150(1)(b) (1989). We agree.

■ ORS 163.150(1)(a) (1989), which was the statutory scheme in effect at the time, provided that "evidence may be presented as to any matter that the court deems relevant to sentence." The standard of relevance in OEC 401 applies in penalty phase proceedings. *Stevens II*, 319 Or at 580. Under

OEC 401, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Evidence which is not relevant is not admissible." OEC 402.

 The function of the doctrine of relevancy is to require that there be some rational relationship between the item of evidence offered by a litigant and the substantive issues properly provable in the case. 22 Wright & Graham, *Federal Practice & Procedure: Evidence* § 5164, at 37 (1978). Relevancy under OEC 401 is a relational concept that carries meaning only in context. *See* Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 4.1, at 183 (1995) (stating principle). Stated differently, "[r]elevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." OEC 401 Commentary, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* at 104 (2d ed 1989).

 Relevance under OEC 401 merges two traditional concepts — relevance and materiality — into a single definition, using the term "relevant" to embrace the two. OEC 401 Commentary, *reprinted in* Kirkpatrick, *Oregon Evidence* at 105. The traditional concept of relevance concerns the relation between the facts in evidence and the conclusions to be drawn from them, while materiality concerns the relation between the proposition for which evidence is offered and the issues in the case. *Id.* Under OEC 401, an offered item of evidence may be excluded as irrelevant for either of two quite distinct reasons: (1) because it is not probative (*i.e.*, does not have any tendency to prove or disprove, or to make more probable or less probable) of the fact or proposition at which it is directed, or (2) because that fact or proposition at which the item is directed is not provable in the case, *i.e.*, is not "of consequence ['material'] to the determination of the action." OEC 401. Thus, relevance under OEC 401 is not only a relational concept, it is also a legally substantive or definitional one. Whether a fact or proposition is provable in the case is determined not by the rules of evidence, but by the pleadings, the other evidence introduced in the case, and the applicable substantive law. *State v. Clowes*, 310 Or 686, 691-92, 801 P2d 789 (1990).

Defendant does not dispute that the state's victim impact evidence tends to prove the fact or proposition at which it was directed, namely, the victims' personal characteristics and the impact of the victims' deaths on their families. The question before us, therefore, is whether that evidence was "material," *i.e.*, whether the impact of the crime on the victims' families was a matter properly provable in the penalty phase of defendant's capital trial.

As the trial court's jury instructions in this case indicate, there were three substantive issues which the jury had to consider. To be relevant, the victim impact evidence must tend to prove one of those three substantive issues. The three issues were presented to the jury pursuant to ORS 163.150(1)(b) (1989), as interpreted by this court in *Wagner II*, 309 Or at 19.

ORS 163.150(1)(b) (1989) provided:

"Upon the conclusion of the presentations of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) If constitutionally required, considering the extent to which the defendant's character and background, and the circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, whether a sentence of death be imposed."[4]

---

[4] In *State v. Wagner*, 309 Or 5, 786 P2d 93, *cert den* 498 US 879 (1990) (*Wagner II*), which we discuss more fully below, this court held that the fourth statutory question, ORS 163.150(1)(b)(D) (1989), lacked "grammatical clarity" and, therefore, provided a new standard instruction for trial courts to read to juries during the penalty phase of a capital trial.

It is within the context of the fourth statutory question, set out in full following our discussion of *Wagner II*, that the state argues that victim impact evidence was admissible in this case.

The first three statutory factors listed above, ORS 163.150(1)(b)(A)-(C) (1989), all require that the jury consider specific aggravating circumstances (*i.e.*, deliberateness, future dangerousness, and unreasonable response to provocation). The existence of an "aggravating circumstance" leads a jury to answer the question "whether the sentence of death [should] be imposed" in the affirmative. The existence of a "mitigating circumstance" weighs against the imposition of the death sentence. The trial court instructed the jury to consider two aggravating circumstances, deliberateness and future dangerousness.[5] The state makes no argument that the victim impact evidence establishes either of those two statutory aggravating circumstances. The state agrees that the victim impact evidence does not tend to prove either defendant's deliberateness in carrying out the crime or defendant's likelihood of future dangerousness.

The state argues that the victim impact evidence tends to prove the existence of an aggravating circumstance under the fourth statutory question,[6] "whether a sentence of death [should] be imposed." ORS 163.150(1)(b)(D) (1989). Defendant argues that the fourth question under ORS 163.150(1)(b)(D) (1989) only permits the consideration of mitigating evidence. For the reasons that follow, we conclude that *only* evidence relating to the existence of mitigating circumstances is relevant to the fourth statutory question provided by ORS 163.150(1)(b)(D) (1989).

To determine whether victim impact evidence is relevant to the fourth statutory question, we look to the legislature's intent in drafting the fourth question. In doing so, the first level of analysis is to examine the text and context of the statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). The context of the statute includes other provisions of the same statute and other related statutes. *Id.* at 611.

---

[5] The third statutory question, *i.e.*, the issue of unreasonable response to provocation, was not raised by the evidence in this case and, therefore, was not presented to the jury for its consideration.

[6] We refer to the query "whether a sentence of death should be imposed" as the "fourth question" because it is the fourth question listed in ORS 163.150(1)(b)(D) (1989). In this case, because there were only three substantive questions at issue, the so-called fourth question was actually the third question presented to the jury.

To review, ORS 163.150(1)(b) (1989) provided that the court shall submit to the jury the fourth question as follows:

"(b) Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"* * * * *

"(D) If constitutionally required, *considering the extent to which the defendant's character and background, and the circumstances of the offense may* **reduce** *the defendant's moral culpability or blameworthiness for the crime,* whether a sentence of death be imposed." (Emphasis added.)

ORS 163.150(1)(b)(D) (1989) focuses on *mitigation* as the purpose of the fourth question. That statute requires the trial court to instruct the jury to consider the extent to which the defendant's character and background and the circumstances of the offense may "reduce the defendant's moral culpability or blameworthiness for the crime."[7] Thus, the text of the statute, and particularly the word "reduce," suggest that the issue before the jury under the "fourth question" is the existence of mitigating circumstances, not aggravating circumstances. The context of ORS 163.150-(1)(b)(D) (1989) further indicates that the issue submitted to the jury under the "fourth question" is the existence of mitigating circumstances.

ORS 163.150(1)(d) (1989) provided:

"The state must prove each issue submitted under subparagraphs (A) to (C) of paragraph (b) of this subsection [*i.e.,* deliberateness, future dangerousness, unreasonable response to provocation] beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue considered."

The statute imposed no similar burden on the state to prove beyond a reasonable doubt the issue submitted to the jury under the "fourth question." *See Wagner II,* 309 Or at 18 (there is no burden of proof on the fourth question). Thus, for

---

[7] Indeed, the trial court's instructions to the jury focused solely on mitigation. The trial court instructed the jury to consider "any aspect of the defendant's character or background or any circumstances of the offense that you believe would justify a sentence less than death."

each of the first three questions under ORS 163.150(1)(b)(D) (1989), which required the jury to consider enumerated aggravating circumstances, the state had the burden to establish the aggravating circumstance beyond a reasonable doubt. The "fourth question" (whether defendant should receive a death sentence), however, did not refer to aggravating circumstances, and provided no burden of proof.

The statutory requirement that the state must prove beyond a reasonable doubt the issues concerning aggravation submitted under the first three questions indicates that the legislature intended that the death penalty would be imposed only on the basis of the enumerated statutory aggravating factors that the state establishes beyond a reasonable doubt. Interpreting the "fourth question," on which neither party has any burden of proof, to allow proof of nonenumerated aggravating factors would allow the imposition of the death penalty on the basis of nonenumerated aggravating factors that were *not* established beyond a reasonable doubt. Such an interpretation would be inconsistent with the legislature's intent to require proof beyond a reasonable doubt of the enumerated aggravating circumstances. Thus, the lack of a burden of proof as to the issue submitted to the jury under the "fourth question" indicates that the legislature did not intend that issue to involve a consideration of aggravating circumstances.

█ The context of a statute also includes this court's interpretations of the statute. *Gaston v. Parsons*, 318 Or 247, 252, 864 P2d 1319 (1994). In *Wagner II*, this court recognized the lack of grammatical clarity of ORS 163.150(1)(b)(D) (1989) and stated that the following jury instruction was correct for the "fourth question" under ORS 163.150(1)(b)(D) (1989):

> "Should defendant receive a death sentence? You should answer this question 'no' if you find any aspect of defendant's character or background, or any circumstances of the offense, that you believe would justify a sentence less than death." 309 Or at 19.

Again, the jury instruction formulated by this court focused solely on whether the evidence of mitigating circumstances

justified a sentence of *less than death*. That statutory interpretation confirmed that the statute referred solely to mitigating circumstances, not to aggravating circumstances.

Following *Wagner II*, this court held on several occasions that the fourth question was enacted to permit the jury to consider the existence of mitigating circumstances. In *State v. Miranda*, 309 Or 121, 131, 786 P2d 155, *cert den* 498 US 879 (1990), this court observed:

> "In the fourth question proposed above we are asking the jury to consider any mitigating aspect of defendant's life, alone or in combination, not necessarily related causally to the offense, in making its finding."

In *Stevens II*, 319 Or at 585 (quoting *Wagner II*, 309 Or at 13), we also stated:

> "The fourth question 'is a mechanism for the sentencing jury to give meaningful effect to its consideration of the entire range of mitigating evidence[.]' "

In each of those cases, this court clearly explained that the purpose of the fourth question was to permit consideration of mitigating evidence that weighs against the sentence of death. *See also State v. Pinnell*, 311 Or 98, 117, 806 P2d 110 (1991) (*Pinnell I*) (the fourth question permits the jury to spare a defendant's life if the jury believes, under all the circumstances, that it is appropriate to do so); *State v. Simonsen*, 310 Or 412, 414, 798 P2d 241 (1990) (*Simonsen I*) (the fourth question permits a jury to spare a defendant from the death penalty).

The text and context of ORS 163.150(1)(b)(D) (1989) clearly indicate that the fourth question under that statute only permits the jury to consider mitigating evidence. The dissent reaches the opposite conclusion. To support that conclusion, the dissent looks to the text, context, and legislative history to determine the statute's meaning. *See* 322 Or at 274-78 (Graber, J., dissenting).

The dissent argues that legislative history of ORS 163.150(1)(b)(D) (1989) indicates that victim impact evidence is admissible under the fourth question. We disagree. Our review of legislative history supports the opposite conclusion. In order to accurately portray the legislative intent of ORS 163.150(1)(b)(D) (1989), it is necessary to examine the background surrounding the enactment of that statute.

Oregon's death penalty scheme originally consisted of three statutory questions. ORS 163.150(2) (1985). Those three questions related to the existence of enumerated *aggravating* circumstances. *See id.* (future dangerousness, deliberation, and unreasonable response to provocation). Under that initial statutory scheme, only those three enumerated aggravating circumstances justified the imposition of a sentence of death. In 1989, the legislature added the "fourth question." Or Laws 1989, ch 790, § 135b. Thus, the question becomes whether, by adding the "fourth question" to Oregon's death penalty scheme, the legislature intended to allow the jury to consider additional non-enumerated aggravating circumstances in deciding whether a defendant should receive a death sentence.

This court recently examined the legislative history of the "fourth question" in *Stevens II*, 319 Or at 580-83. In that case, this court recalled that the "fourth question" was enacted to make Oregon's death penalty scheme comply with the requirements of the Eighth Amendment to the Constitution of the United States, as those requirements were interpreted in *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989). *Stevens II*, 319 Or at 581.

In *Penry*, the Supreme Court of the United States held that a death sentence imposed under the Texas three-question statutory sentencing scheme, on which Oregon's scheme was based, was unconstitutional, because it did not give the jury a meaningful opportunity to "give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime."[8] *Penry*, 492 US at 328. In *Penry*, the Supreme Court stated:

---

[8] *Penry* followed a long line of Supreme Court cases on the Eighth Amendment which required that the factfinder consider the capital defendant as an individual person.

In *Woodson v. North Carolina*, 428 US 280, 96 S Ct 2978, 49 L Ed 2d 944 (1976), the Court concluded that, in a capital case, the respect for humanity underlying the Eighth Amendment required a trial court to consider the character and record of the individual and the circumstances of the offense. In *Eddings v. Oklahoma*, 455 US 104, 102 S Ct 869, 71 L Ed 2d 1 (1982), the sentencing judge refused to hear evidence of the defendant's troubled youth, beatings by her father and severe emotional disturbance; the Supreme Court remanded, holding that the Eighth Amendment required consideration of the defendant's character and record as well as the circumstances of the offense. This concept was carried further in *Skipper v. South Carolina*, 476 US 1, 106 S Ct 1669, 90 L Ed 2d 1 (1986), where the Court held that testimony of two prison officials and a regular visitor of defendant during his incarceration between arrest and trial should have been admitted to show his adaptability to prison life.

"In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence. * * * Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a reasoned *moral* response to the defendant's background, character, and crime. * * * In order to ensure reliability in the determination that death is the appropriate punishment in a specific case, * * * the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime." 492 US at 327-28 (emphasis in original; citations and internal quotation marks omitted).

Thus, under *Penry*, the constitution requires that the jury have broad discretion in considering relevant mitigating circumstances, and it imposes "carefully defined standards that must narrow a sentencer's discretion to impose the death sentence."

In enacting ORS 163.150(1)(b)(D) (1989), the legislature was attempting to bring Oregon's death penalty scheme in compliance with *Penry*. *Stevens II*, 319 Or at 581. When the "fourth question" (whether the defendant should receive a death sentence) was added, the Oregon death penalty scheme already had "carefully defined standards" that narrowed the imposition of the death sentence, in the form of three questions relating to enumerated statutory aggravating circumstances. Thus, in order to comply with *Penry*, the legislature added the fourth question to allow the jury to "consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime." *Penry*, 492 US at 327-28.

In *Wagner II*, this court explained how adding a fourth question to Oregon's original three-question death penalty scheme was required to satisfy the requirements of *Penry*. This court explained:

"In June 1989, the United States Supreme Court so held [that the federal constitution requires some avenue for the sentencing jury to give meaningful effect to *mitigating* evidence relevant outside or beyond the statutory issue] in *Penry*, a case involving the Texas statute in which the Oregon statute has its roots. In *Penry*, the Supreme Court appears to have put its imprimatur on a fourth question *as one mechanism for the sentencing jury to give meaningful effect to its consideration of the entire range of possible mitigating evidence*[.]" 309 Or at 13 (emphasis added).

When *Penry* was decided, ORS 163.150 (1987) provided that the jury was to be instructed in the penalty phase of a capital trial as to three issues (deliberateness, future dangerousness, and response to provocation). The statute did not expressly provide for a "fourth question." The court recognized, however, that if the statute did not permit a "fourth question," the statute would be facially unconstitutional. *Wagner II*, 309 Or at 8.

The *Wagner II* court's discussion of the facial validity of ORS 163.150 (1987) makes clear that the focus of the constitutionally required mechanism of a fourth question was on the consideration of *mitigating* circumstances. This court held that Oregon's death penalty scheme was not unconstitutional because "ORS 163.150 [(1987)] permits a *general mitigation question*." 309 Or at 14. The *Wagner II* court proceeded to adopt the approach suggested by Justice Gillette's dissenting opinion in *Wagner I*:

"Justice Gillette's dissent in *Wagner [I]* states:

" 'None of the foregoing [discussion of the federal precedents] necessarily requires holding that the Oregon statutory scheme is unconstitutional on its face. *This court could so construe the statute as to permit the admission of all mitigating evidence and to require an instruction to the jury delineating the scope of the jury's authority to reprieve an otherwise death-eligible defendant on the basis of that [mitigating] evidence.*

" 'I do not here propose any particular solution. One solution perhaps would be to instruct the jury that, even if it concludes that all three statutory questions should be [309 Or at 14] answered 'yes,' it nonetheless should answer one of them 'no' unless it unanimously concludes that the *mitigating evidence* does not call for a lesser

penalty. A second alternative might have the jury answer a fourth, constitutionally-required question after the three statutory ones: After considering all the *mitigating evidence*, does the jury still unanimously conclude that the prisoner should be put to death, rather than spared?' * * * 305 Or at 232-33, 752 P2d 1136 (Gillette, J., dissenting). (Emphasis added.)

"In view of what we have learned from *Penry*, it is now clear that *mitigating evidence beyond the scope of the statutory issues* is indeed constitutionally "relevant to sentence" and, accordingly, statutorily admissible. *See State v. Wagner*, 305 Or at 156-67, 752 P2d 1136; ORS 163.150(1)(a) [(1987)]. *The step from admissibility of such evidence to meaningful consideration by the jury, suggested by Justice Gillette as a possibility of statutory construction in Wagner and required by the Supreme Court in Penry for a constitutionally valid death sentence, is the step we now take." Wagner II*, 309 Or at 13-14 (emphasis added).

Thus, the fourth question (whether the defendant should receive a death sentence), which this court created in *Wagner II*, was developed for the sole purpose of giving effect to the constitutional requirement that the jury must consider mitigating evidence. Indeed, the point of the fourth question was to give the jury an opportunity, after considering all *mitigating* evidence, to decide to spare a defendant's life, notwithstanding affirmative answers to the first three questions which related to the existence of aggravating circumstances.

We now turn to the legislative history that followed this court's decisions discussed above.

The dissent contends that the legislative history of ORS 163.150 (1989) provides support for its position that the fourth question permits the consideration of aggravating evidence. To that end, the dissent argues that the testimony of Dale Penn, a representative of the Oregon District Attorney's Association, sheds significant light on the purpose of ORS 163.150(1)(b)(D) (1989). 322 Or at 277 (Graber, J., dissenting). There are several problems with the dissent's approach. First, the dissent relies almost exclusively on the inconclusive testimony of one person, Penn. Penn is a witness and representative of a district attorney's association; he is not a legislator. As such, his statements say little about the intent of the Oregon Legislative Assembly as a whole.

The majority opinion, on the other hand, attempts to discern the general intent of the Legislative Assembly when it enacted ORS 163.150(1)(b)(D) (1989). Our opinion does so by analyzing ORS 163.150(1)(b)(D) (1989) as a legislative response to the Supreme Court's decision in *Penry*. The general intent of the Legislative Assembly was to make ORS 163.150 (1989) constitutional in light of *Penry* by providing a mechanism for the consideration of mitigating evidence. This is the same approach we took when we examined the legislative history of ORS 163.150(1)(b)(D) (1989) in *Stevens II*, 319 Or at 581.

It is curious that the dissent relies so heavily on the testimony of one witness. Recently, the author of the dissenting opinion made a general observation about the use of legislative history. The author stated:

"In general, an examination of legislative history is most useful when it is able to uncover the manifest general legislative intent behind an enactment. By contrast, an examination of legislative history is most fraught with the potential for misconstruction, misattribution of the beliefs of a single legislator or witness to the body as a whole, or abuse in the form of 'padding the record' when the views of only a small number of persons on a narrow question can be found." *Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or 509, 539 n 4, 888 P2d 544 (1995) (Graber, J., dissenting).

Penn's opinions concerning ORS 163.150(1)(b)(D) (1989) are merely the views of one witness and do not evidence the general intent of the Legislative Assembly.

Even if we were to find Penn's views persuasive, they do not support the dissent's conclusion that ORS 163.150(1)(b)(D) (1989) permits the jury to consider victim impact evidence under the fourth question. Penn testified that the fourth question

"allows all the mitigating circumstances to be in there, all kinds of arguments by the state and the defense both for or against death whether or not it — the other three questions are relevant and that's the intent of the Supreme Court's opinion [in *Penry*]." Senate Judiciary Committee, June 29, 1989, Tape 256, Side A at 160-75.

First, we point out what Penn did not say. He did not say that the fourth question permits the state to introduce evidence of

aggravating circumstances. Rather, he stated that the fourth question would permit both the state and the defense to make arguments "for or against death." Penn's statement simply confirms that the state and defense may make arguments for or against the death penalty under each question. *See* ORS 163.150(1)(a) (1985) ("the state and the defendant * * * shall be permitted to make arguments *for or against a sentence of death*" (emphasis added)); ORS 163.150(1)(a) (1989) (same); ORS 163.150(1)(a) (1993) (same). For example, the state may argue that, under the fourth question, any mitigating circumstances offered by defendant should not lead the jury to spare defendant's life. Penn's statement that the state has the right to make arguments for the death penalty is not, as the dissent asserts, the same as saying that the state has the right to introduce aggravating evidence under the fourth question.

If the intent of Penn's testimony was that the state has the right to introduce aggravating evidence under the fourth question, it is curious that he concluded his remarks by stating "that's the intent of the Supreme Court's opinion [in *Penry*]." The intent of the Supreme Court's opinion in *Penry* was not to let in more aggravating evidence. In fact, it was just the opposite; the intent of the opinion was to allow the jury to consider mitigating circumstances that may weigh against the imposition of the death sentence. *Penry*, 492 US at 327-28.

If the dissent believes that we can glean some legislative intent from the statements of witnesses who testified before the legislative committees, the dissent has overlooked the statements of two important witnesses. Both the Attorney General and the Solicitor General, acting in their official capacities, testified as to the purpose of ORS 163.150-(1)(b)(D) (1989). The Attorney General, Dave Frohnmayer, remarked:

> "It is our judgment that legislative clarification which involves the addition explicitly in the statute of *a fourth factor that is a consideration of **mitigating** circumstances* which the United States Supreme Court has suggested may be constitutionally required would be desirable by this Legislative Assembly in order to eliminate lack of clarity or possible concern about the reach and scope of Oregon's present capital punishment law." Senate Judiciary Committee, June 29, 1989, Tape 255, Side A at 45 (emphasis added).

The Solicitor General, Virginia Linder, then added:

"The language we've chosen is, as, as best we can, a model of what the U.S. Supreme Court really has said in its decision in *Penry*. Essentially, it [the proposed amendment] would require a fourth question or issue to be submitted to the jury in those circumstances where the constitution requires that *some other factor related to a defendant's background, character, or circumstances of the offense mitigate against a sentence of death,* but that factor is not otherwise encompassed within the three issues that have already statutorily been required." *Id.* at 60 (emphasis added).

The comments of the Attorney General and Solicitor General provide additional support to the view that the fourth question was enacted in order to allow the jury to take into account mitigating circumstances that weigh against a sentence of death.

This was the view taken by this court in *Wagner II*. In *Wagner II*, we concluded that in order to comply with *Penry*, Oregon's death penalty scheme must include a mechanism that allows the jury an opportunity to spare a defendant's life in light of any mitigating circumstances. 309 Or at 14. Accordingly, the "fourth question" was intended as a mechanism to allow the jury to give full effect to any *mitigating* circumstances.

Based on the text, context, and legislative history of ORS 163.150(1)(b)(D) (1989), we conclude that the issue submitted to the jury under the "fourth question" is whether any *mitigating* circumstances exist that would justify a sentence of life rather than death. To conclude otherwise would allow the jury to consider a nonstatutory aggravating factor beyond the three aggravating factors specifically enumerated in the statute. We find nothing in the text, context or legislative history of ORS 163.150(1)(b)(D) (1989) to indicate that the legislature intended that the jury could consider aggravating victim impact evidence under the fourth question.

The victim impact evidence presented in this case was not relevant to any of three substantive issues (deliberateness, future dangerousness, and whether defendant should receive a death sentence) that the court instructed the jury to consider in the penalty phase of defendant's capital trial under ORS 163.150(1)(b) (1989).

■ The next issue for this court is whether victim impact evidence is made admissible during the penalty phase of capital cases under ORS 137.013 even though that evidence is not relevant under ORS 163.150(1)(b)(D) (1989).

ORS 137.013 provides:

"At the time of sentencing, the victim or the victim's next of kin has the right to appear personally or by counsel, and has the right to reasonably express any views concerning the crime, the person responsible, the impact of the crime on the victim, and the need for restitution and compensatory fine."

In essence, the state argues that ORS 137.013 makes victim impact evidence admissible in the penalty phase of defendant's capital trial, irrespective of its relevance under ORS 163.150(1)(b)(D) (1989). We disagree. For the reasons that follow, we conclude that ORS 137.013 was not intended to render otherwise irrelevant victim impact evidence admissible in the penalty phase of a capital case.

■ Capital cases require our most vigilant and deliberative review. We agree with the United States Supreme Court statement that "[d]eath is a punishment different from all other sanctions in kind rather than degree" so that "there is a difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 US 280, 303-05, 96 S Ct 2978, 2991, 49 L Ed 2d 944, 961 (1976). Similarly, in this case, because "death is a punishment different from all other[] [sanctions]," we must be certain that the voters in enacting ORS 137.013 as part of Ballot Measure 10 intended that victim impact statements be admitted as evidence in capital cases. Of course, we are not authorized to rewrite a statute or ignore its plain meaning. *Lane County v. Heintz Const. Co., et al*, 228 Or 152, 157, 364 P2d 627 (1961). We cannot insert into a statute what has been omitted, nor omit what has been inserted. ORS 174.010.

■ ■ As previously stated, this court considers the subconstitutional arguments before it examines the state or federal constitutional issues, *Stevens II*, 319 Or at 579. We begin our analysis, therefore, by interpreting ORS 137.013. ORS 137.013 was enacted by the people as part of Ballot Measure 10 (the "Crime Victim's Bill of Rights") in the

November 1986 general election. Or Laws 1987, ch 2, § 10. This court applies the same method of statutory analysis to a statute enacted by the voters as it would to a statute enacted by the Legislative Assembly. *PGE*, 317 Or at 612 n 4.

In interpreting a statute enacted by initiative, the court's task is to discern the intent of the voters who passed the initiative. *Id.* at 610. As we said earlier, to determine the intent of the voters, we first look to the text and context of the statute. *Id.* at 610. The text of the statute is the starting point because the text is the best evidence of the voters' intent. *Id.* at 610. Because ORS 137.013 was enacted by the voters as part of Ballot Measure 10, we examine the text of ORS 137.013 in the context of Ballot Measure 10.

The text of ORS 137.013 does *not*, by its terms, declare that victim impact evidence shall be admissible as evidence in the penalty phase of capital trials. By contrast, other provisions of Ballot Measure 10, by their terms, declare that certain evidence shall be admissible in criminal homicide trials. For example, ORS 41.415, which was enacted as part of Ballot Measure 10, provides:

> "In a prosecution for *any criminal homicide,* a photograph of the victim while alive *shall be admissible evidence* when offered by the district attorney to show the general appearance and condition of the victim while alive." (Emphasis added.)

The difference in wording regarding admissibility of evidence is significant. When the legislature uses different terms in related statutes, we presume that the legislature intended different meanings. *See PGE*, 317 Or at 611 (stating general principle). If the voters intended to require the admission of victim impact evidence in every criminal trial — whether relevant or not — they did not say so explicitly. Indeed, the text of ORS 137.013, in contrast to ORS 41.415 is qualified — "[a]t the time of sentencing," a victim has a right *"reasonably* to express" his or her views. That change does not alter any rule regarding the admissibility of evidence in the penalty phase of a capital trial. The textual differences between ORS 137.013 and ORS 41.135 suggest that ORS 137.013 was not intended to provide for the admission of victim impact evidence in the penalty phase of a capital trial.

The text also contains no indication that the voters in enacting ORS 137.013 intended to amend either expressly or by implication the specific penalty phase procedures that ORS 163.150 (1985)[9] required in capital cases. If the voters intended to alter the penalty phase procedures for capital cases set forth in ORS 163.150 (1985), they could have easily done so by expressly amending that statutory provision. However, the voters did not amend ORS 163.150 (1985). ORS 137.013 was specifically added to chapter 137 of the Oregon Revised Statutes. Ballot Measure 10, section 10, provided that "this section [now ORS 137.013] is added to and made a part of ORS Chapter 137." *See* Ballot Measure No. 10, State of Oregon, 1986; Or Laws 1987, ch 2, § 10. Chapter 137 contains *general* provisions regarding sentencing, parole, and probation for *noncapital cases*. Specific procedures for sentencing in capital cases, as noted above, are set forth separately in chapter 163.

Nothing in the text of ORS 137.013 suggests that it was intended to alter the standards by which the court makes sentencing decisions under ORS 163.150 (1985). As stated previously, when we interpret a statute, we are prohibited from inserting what the lawmakers omitted. *PGE*, 317 Or at 611; ORS 174.010.

 The voters also did not amend ORS 163.150 (1985) by implication when they enacted ORS 137.013. As a matter of statutory interpretation, "[w]e generally do not assume that a statute is intended to repeal or amend another by implication." *Wilson v. Matthews*, 291 Or 33, 37, 628 P2d 393 (1981). Amendment by implication is "disfavored by this court" and is only recognized "when the matter is clear." *State ex rel Med. Pear Co. v. Fowler*, 207 Or 182, 195, 295 P2d 167 (1956).

Construing these two statutes so as to give effect to both, we hold that ORS 137.013 does not amend by implication the penalty phase procedures for capital cases set forth in ORS 163.150 (1985). *Wilson*, 291 Or at 37. Both statutes can be given effect if we interpret ORS 137.013 to apply only to noncapital cases. This construction preserves ORS

---

[9] We consider the 1985 statute at this point because that was the statute in effect at the time the voters enacted ORS 137.013 in the November 1986 election.

137.013 by giving victims the right to make statements in all noncapital cases "at the time of sentencing." Because the voters specifically added ORS 137.013 to the chapter which provides the procedure for sentencing, parole and probation for all noncapital cases, this construction appears consistent with the voters' intent when they enacted ORS 137.013.

This construction also gives effect to ORS 163.150 (1985) by preserving the carefully drafted penalty phase procedures that statute requires in capital cases. If the people intended to amend by implication the penalty phase procedures for capital cases set out in ORS 163.150 (1985), that amendment would have the effect of expanding the scope of aggravating circumstances that could be considered in the sentencing decision by the jury. ORS 163.150 (1985) specifically designates the three aggravating factors that justify a sentence of death. Reading ORS 137.013 to require the admission of aggravating evidence that is unrelated to those three aggravating factors would have the effect of implicitly altering the carefully drafted penalty phase procedures set forth in ORS 163.150 (1985). Nothing in the text of ORS 137.013 indicates that the people intended to alter that carefully drafted penalty scheme.

The context of Ballot Measure 10 also indicates that the drafters of that measure were aware that special procedures applied to capital cases because certain sections of the measure expressly apply to capital cases. *See* Or Laws 1987, ch 2, § 7 (amending ORS 136.230 to make limits on peremptory challenges apply to "capital offense[s]" ); *id.*, § 8 (providing for admission of photograph of the victim "in a prosecution for *any* criminal homicide"). (Emphasis added.) By contrast, the text of ORS 137.013, also enacted as part of Ballot Measure 10, makes no special reference to changing the penalty phase procedures in capital cases or in cases involving criminal homicide. In light of the express changes made to the penalty phase procedures in capital cases by other provisions of Ballot Measure 10, we conclude that ORS 137.013, which makes no special reference to changing the procedures for capital cases, did not alter the penalty phase procedures for capital cases set forth in ORS 163.150 (1985).

Our analysis of the context of the statute also includes consideration of rules of construction because some

of those rules "bear directly on the interpretation of the statutory provision in context." *PGE*, 317 Or at 611; *Gaston*, 318 Or at 253. One rule of construction which bears directly on the interpretation of ORS 137.013 is set forth in ORS 174.020, which provides:

> "In the construction of a statute the intention of the legislature is to be pursued if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it."

Thus, when one statute deals with a subject in general terms and another deals with the same subject in a more minute and definite way, the two should be read together and harmonized, if possible, while giving effect to a consistent legislative policy. *State v. Pearson*, 250 Or 54, 58, 440 P2d 229 (1968). However, if the two statutes cannot be harmonized, "the specific statute is considered an exception to the general statute." *Id.*; *Smith v. Multnomah County Board of Commissioners*, 318 Or 302, 309, 865 P2d 356 (1994) (citing *Colby v. Larson*, 208 Or 121, 126-27, 297 P2d 1073, 299 P2d 1076 (1956)).

This case involves the interpretation of two statutes, a general and specific statute. ORS 137.013 is a *general* statute that appears in a chapter containing the sentencing procedures for noncapital cases. ORS 137.013 gives victims or their next of kin the right to make impact statements in person or by counsel at the time of sentencing in criminal cases generally.

ORS 163.150(1) (1989) is a more specific statute. ORS 163.150(1) (1989) sets forth the specific procedures for a jury to follow in the penalty phase prior to the pronouncement of sentence in a capital case. As we previously stated, ORS 163.150(1) (1989) provides four specific questions — three questions in this case — that a jury must resolve before a trial court sentences a defendant in a capital case.

If we were to adopt the state's interpretation of ORS 137.013, that statute would conflict with ORS 163.150(1) (1989). The state maintains that ORS 137.013 provides that victim impact evidence is admissible during the penalty phase of a capital case. ORS 163.150(1)(a) (1989), however,

provides that only relevant evidence may be presented during the penalty phase of a capital case. As we have demonstrated earlier in this opinion, victim impact statements are not "relevant to sentenc[ing]" in capital cases under ORS 163.150(1)(b) (1989), because those statements are not relevant to any of the four substantive questions that a jury must answer pursuant to that statute and *Wagner II*, 309 Or at 18.

Under the state's interpretation, therefore, there is an inconsistency between the two statutes. ORS 137.013, according to the state, provides that victim impact evidence is admissible in the penalty phase of a capital case. As we have shown earlier in this opinion, ORS 163.150(1)(b)(D) (1989) bars the admission of such evidence in the penalty phase of a capital case.

Any inconsistency between those two statutes can be resolved, however, if we construe ORS 137.013 to apply only to sentencing in noncapital cases. That construction gives effect to both statutes. As we stated above, that construction preserves the legislative policy of ORS 163.150(1) (1989) by preserving the carefully drafted sentencing scheme evident in that statute. It also ensures that the jury consider only relevant evidence during their deliberations in the penalty phase of a capital case.

That construction also preserves the legislative policy of ORS 137.013. Our interpretation of ORS 137.013 ensures that victims and their next of kin have the right to make impact statements in person, during sentencing, and before a judge in all noncapital criminal trials. Before the enactment of ORS 137.013, victims did not have the right to make victim impact statements in person. First, the trial court was not required to conduct a sentencing hearing. *See* ORS 137.080 (1985) (trial judge had discretion as to whether to conduct a sentencing hearing). More significantly, victims only had the right to express their views in writing as part of a presentence report. ORS 137.530(2) (1985) provided in part:

"Whenever a presentence report is made, the preparer of the report shall make a reasonable effort to contact the victim and obtain a statement describing the effect of the defendant's offense upon the victim. * * * The preparer of the report shall include the statement of the victim in the presentence investigation report."

Under ORS 137.090 (1985), the trial court was permitted, but was not required, to consider the presentence report before sentencing the defendant. ORS 137.090 (1985). In the context of noncapital indeterminate sentencing, ORS 137.013 removes a trial court's discretion in deciding whether a victim will be heard personally at the time of sentencing, as opposed to having the victim's views expressed through the presentence report.

Our analysis of the text and context of ORS 137.013 leads us to these conclusions: ORS 137.013 was not intended to render otherwise irrelevant evidence admissible during the penalty phase of capital trials;[10] rather, ORS 137.013 was intended to give victims or their next of kin the right to appear in person or through an attorney at the time of sentencing in all *non*capital criminal trials.

In summary, the victim impact evidence presented during the sentencing proceeding in this case was not relevant to any fact or proposition provable under ORS 163.150(1) (1989) and, therefore, was inadmissible under that statute. In addition, an analysis of the text and context of ORS 137.013 indicates that ORS 137.013 did not alter the specific capital sentencing procedures set forth in ORS 163.150(1) (1989). The trial court erred in admitting the victim impact evidence in this case.[11]

The error in this case was not harmless. We cannot say that there was little likelihood that the error affected the verdict. *See State v. Johnson*, 313 Or 189, 201, 832 P2d 443 (1992) (standard for determining whether evidentiary error

---

[10] Our decision is based entirely on statutory law. In *Payne v. Tennessee*, 501 US 808, 827, 111 S Ct 2597, 2609, 115 L Ed 2d 720, 736 (1991), the United States Supreme Court held that the Eighth Amendment to the Constitution of the United States does not create a *per se* bar to the admissibility of victim impact evidence in the penalty phase of a capital case. *Payne* did *not* hold, however, that victim impact evidence *must* be admitted in capital cases, or even that it should be admitted. *Payne* made clear that whether such evidence is relevant is a matter of state law. 501 US at 827.

Nothing in our decision prevents the Oregon legislature from amending ORS 163.150 to change the inquiries relevant to sentencing under ORS 163.150 in such a way as to render victim impact evidence relevant in the sentencing phase of capital trials. Indeed, it appears that the 1995 Legislative Assembly may have done so. *See* Or Laws 1995, ch 531, § 3; Or Laws 1995, ch 657, § 23 (amending ORS 163.150).

[11] Because of our disposition of this assignment of error, we are not required to consider any of defendant's other assignments of error.

is harmless is consistent with the standard for reversible error set forth in Article VII (Amended), section 3, of the Oregon Constitution. Under that standard, error is harmless if there is little likelihood that the error affected the verdict.).

The sentence of death is vacated. This case is remanded to the circuit court for further proceedings.

**GRABER, J.,** dissenting.

Because evidence of the victims' character and background was admissible, I dissent. The majority distorts the applicable statutes and thereby thwarts the will of the people.

## PERTINENT TRIAL PROCEEDINGS

Before the penalty phase of defendant's trial began, defendant moved *in limine* to prevent the admission of so-called "victim impact" evidence. He relied on the Eighth and Fourteenth Amendments to the United States Constitution and also asserted that such evidence would "[v]iolate[] the right to an impartial jury secured by Article I, section 11, of the Oregon Constitution." At the time, *Booth v. Maryland*, 482 US 496, 107 S Ct 2529, 96 L Ed 2d 440 (1987), described the federal constitutional limits on the presentation of such evidence. The trial court granted defendant's motion.

After *voir dire*, but before opening statements, the Supreme Court of the United States overruled *Booth* in *Payne v. Tennessee*, 501 US 808, 111 S Ct 2597, 115 L Ed 2d 720 (1991). The next day, the state informed defendant and the court that it intended to introduce evidence from the victims' family about the victims that was consistent with *Payne*. The state asserted that it intended to present evidence on two issues: (1) "What kind of people were [the victims]," and (2) "how did the manner of their deaths affect the people directly impacted by them." The state also told the court that it did not intend to ask the family members their opinions of the crime or what the sentence ought to be.[1]

---

[1] *Payne* held that, "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." 501 US at 827. *Payne* did not address the holding in *Booth* that the Eighth Amendment bars admission of opinions of the victim's family about the crime, the defendant, and the appropriate penalty. *Payne*, 501 US at 830 n 2.

The trial court noted that ORS 137.013 appeared to make the evidence that the state proposed to offer admissible as a matter of state law. Defendant argued to the court that ORS 137.013 "does not apply to capital sentencing proceedings" and that, if it does, the statute violates the Oregon Constitution. The court then took the matter under advisement. Three days later, before opening statement, the trial court ruled: "[T]here's no p[er] se prohibition against victim impact evidence, and Oregon has a statute allowing that kind of evidence."

The testimony now challenged fell within the parameters described by the state to the trial court. In addition to testifying about facts of the crime (such as the children's description of discovering their parents' bodies and the family members' identification of the victims' personal property that was found in defendant's possession), the family members described what kind of people the victims were and what they did for a living. Defendant did not ask the court to reconsider its initial ruling in the light of that testimony, nor did he argue that the testimony went beyond what ORS 137.013 would allow. As noted, defendant argued (as the majority now holds) that the statute does not apply in a capital case.

## ORS 137.013

In my view, the statute on which the trial court relied supports the trial court's ruling. In construing a statute, this court first examines its text and context and, if the legislative intent is clear from that examination, the court inquires no further. *PGE v. Bureau of Labor and Industries,* 317 Or 606, 610-11, 859 P2d 1143 (1993). The same method of analysis applies to initiated statutes. *Id.* at 612 n 4. In the present case, the text and context of ORS 137.013 make clear the people's intent when they adopted it as part of Ballot Measure 10 (Or Laws 1987, ch 2), also known as the "Crime Victims' Bill of Rights." Or Laws 1987, ch 2, § 1. The majority's strained interpretation is, in a word, bizarre.

ORS 137.013 provides:

> "At the time of sentencing, the victim or the victim's next of kin has the right to appear personally or by counsel, and has the right to reasonably express any views concerning

the crime, the person responsible, the impact of the crime on the victim, and the need for restitution and compensatory fine."

By its terms, that statute applies at the time of *any sentencing whatsoever*, including a sentencing that may (or, of course, may not) lead to imposition of the death penalty.

The phrase "next of kin" suggests strongly that the statute applies in homicide cases. Any doubt in that regard is dispelled by ORS 131.007, which defines the term "victim," as it is used in ORS 137.013, to "include[], in the case of a homicide * * *, a member of the immediate family of the decedent." The applicable definition draws no distinction between capital and noncapital homicides.

It is equally clear that the "Crime Victims' Bill of Rights" did not single out for *fewer* rights the relatives of victims of *the most serious* of homicides — those in which the death penalty is sought. Other sections of Ballot Measure 10 demonstrate that the initiative as a whole encompasses capital cases.

For example, Section 7 of Ballot Measure 10 added to ORS 136.230 a provision for additional peremptory challenges for the state *in capital cases*. Or Laws 1987, ch 2, § 7. That section indicates that the initiative as a whole was intended to cover capital murder cases.

In addition, Section 8 of Ballot Measure 10 adopted ORS 41.415, which provides that, "[i]n a prosecution for any criminal homicide," a photograph of the victim while alive shall be admissible when offered by the state. That section demonstrates that the initiative considered all criminal homicides to be in a single category, covered by the terms of the initiative. Indeed, this court has held that ORS 41.415 applies in capital cases. *State v. Williams*, 313 Or 19, 27-28, 828 P2d 1006, *cert den* 506 US 858, (1992); *State v. Nefstad*, 309 Or 523, 560, 789 P2d 1326 (1990).

It also is clear that "sentencing" occurs in capital cases. ORS 163.150 uses the term "sentencing" many times, in describing what happens in a capital case. That sentencing occurs at a "time," the time set for the penalty phase of the trial.

Finally, we know from Ballot Measure 10 itself what the people intended to accomplish by its enactment. The preamble to Ballot Measure 10 provided in part that "[t]he purpose of this ballot measure is to declare to our legislature and our courts that victims' rights shall be protected at each stage of the criminal justice system." Or Laws 1987, ch 2, § 2.

Even if the text and context of ORS 137.013 were not clear, the legislative history would eliminate any uncertainty. The explanatory statement in the November 1986 Voters' Pamphlet stated that the purpose of Ballot Measure 10 was, in part, to *"[e]nsure victim[s]*, in person * * *, *the right* to express views in court at sentencing." Official 1986 General Voters' Pamphlet at 52 (emphasis added). Again, there is no hint of a limitation that such rights of victims would be ensured only for *less* serious crimes, but excluded for *the most* serious crimes.

In summary, the intent of the people is clear. ORS 137.013 applies uniformly to all criminal cases at the time of sentencing and contains no exception for capital sentencing proceedings. A fair reading of the text and context (even without resort to confirming legislative history) shows that the purpose of ORS 137.013 was to ensure that *no* sentencing proceeding in Oregon focuses exclusively on the defendant; every such proceeding also is to include consideration of the costs that the defendant's crime imposed on the victim and, in the case of homicides, on the victim's next of kin. The statute, in other words, makes the impact on the victim relevant to *every* sentencing proceeding. And, it authorizes the admission of such evidence by making the opportunity of the homicide victim's next of kin to speak on the designated topics a "right."

## ORS 163.150 (1989)[2]

Because ORS 137.013 provides that "victim impact" evidence is to be considered in capital (as well as other criminal) cases, the next question is whether ORS 163.150 (1989) precluded the sentencing jury from hearing such evidence. It did not.

---

[2] In 1995, the legislature amended ORS 163.150(1)(a) to allow the admission of victim impact evidence of the type at issue in this case at the sentencing phase of a capital case. Or Laws 1995, ch 531, § 2 & ch 657, § 23.

The two statutes are consistent. ORS 137.013 specifies that one type of evidence is relevant to the sentencing jury's decision in capital cases; it reflects the people's determination that the harm caused by a defendant's criminal act is relevant to sentencing and is admissible. ORS 163.150 (1989) sets out four questions that the jury must answer. The wording of those questions did not preclude the sentencing jury from considering victim impact evidence. The fourth question asked broadly "whether a sentence of death be imposed." ORS 163.150(1)(b)(D) (1989). As worded, the fourth question was neutral, not one-sided. It permitted the jury to take into account the harm that a defendant caused to the victim or victim's next of kin, among other factors, in deciding the appropriate sentence.

In *State v. Stevens*, 319 Or 573, 580-84, 879 P2d 162 (1994) (*Stevens II*), this court considered the legislature's intent in adding the fourth question to ORS 163.150. After tracing the history of the fourth question, the court concluded that the sentencing jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or relevant to the circumstances of the crime. *Id.* at 583. The court then held that the defendant's offer of proof included testimony that could provide circumstantial evidence of some mitigating aspect of the defendant's character or background, making it relevant to the fourth question; therefore, the trial court erred in excluding the proffered evidence. *Id.* at 584-85.

*Stevens II* construed the requirements of ORS 163.150 respecting what kinds of mitigating evidence must be admitted as relevant. The court was not called on, however, to consider the converse: whether the statute makes *non*mitigating evidence *irrelevant*. Neither does its holding answer that question indirectly. To the extent that *Stevens II* contains any suggestion at all on the point now in issue, it is an implicit assumption that victim impact statements are relevant and admissible and that the defendant's opportunity to introduce evidence of his or her character and background was meant to parallel or balance the opportunity that already existed to do the same respecting the victim:

"We agree that testimony by the relatives of a capital defendant may be informative about certain aspects of the defendant's character. *Cf. Payne v. Tennessee*, 501 US 808, 111 S

Ct 2597, 115 L Ed 2d 720 (1991) (recognizing that testimony by loved ones about impact of loss of murder victim says something about the character of the victim)." *Id.* at 583-84.

*See also State v. Wagner*, 309 Or 5, 18, 786 P2d 93 ("[t]here is no burden of proof on the fourth question because it does not present an issue subject to proof in the traditional sense, rather, it frames a discretionary determination for the jury"), *cert den* 498 US 879 (1990).

In short, a reading of the text and context of ORS 163.150 (1989) shows that it was compatible with ORS 137.013. Even if the legislative intent were not clear from the text and context, however, the legislative history likewise shows that the legislature did not intend the 1989 amendment to ORS 163.150 to preclude the kind of evidence that is at issue here. *See PGE*, 317 Or at 611-12 (if the intent of the legislature is not clear from the text and context, this court will consider legislative history).

The main messages derived from the legislative history of the 1989 amendment to ORS 163.150 track its text: to add mitigation but not to exclude anything. The Oregon legislature added the fourth question to ORS 163.150 in 1989 in response to the decision of the Supreme Court of the United States in *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989). Minutes, Senate Committee on Judiciary, HB 2250, June 29, 1989, at 2 (statements of Dave Frohnmayer, Attorney General, and Virginia Linder, Solicitor General). That is the consistent and overarching theme of the legislative history as a whole. *See also Stevens II*, 319 Or at 582-83.

It also is clear from the legislative history as a whole, however, that (1) the legislature did not intend to *exclude* any category of evidence, (2) the legislature did not intend to do any more to benefit capital defendants than what *Penry* required, and (3) it was *assumed* that "aggravating" as well as "mitigating" facts would be introduced during the penalty phase of a capital trial. The following example reflects the foregoing points.

The following version of the fourth question was proposed:

"If constitutionally required, considering the extent to which the defendant's character and background, and the circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, should a sentence of death be imposed?"

Tape Recording, Senate Committee on Judiciary, June 29, 1989, Tape 256, Side A at 86. One of the senators objected that the proposed wording was confusing. *Id.* at 144 (remarks of Sen. Shoemaker). In response, the witness who was then testifying, Dale Penn, explained how the fourth question worked. He told the committee that the proposed wording allowed both the state *and* the defendant to present arguments for *and* against the death penalty, even though such arguments were not already relevant to the first three questions.

"And the issue is, 'Should the death sentence be imposed?' That allows all the mitigating circumstances to be in there, all kinds of arguments *by the state* and the defense *both for or against death* whether or not it — the other three questions are relevant and that's the intent of the Supreme Court's opinion [in *Penry*]."

*Id.* at 160-75. Immediately after that explanation, Senator Hill moved to substitute "the language just described" for the prior proposal. *Id.* at 188. With very minor alterations not pertinent to the issue here, "the language just described" became what was the applicable version of ORS 163.150 (1989).

The legislative history shows, as noted, that the fourth question was intended to allow the jury to give effect to a broad range of mitigating evidence that could not be considered in deciding the first three questions. *Stevens II*, 319 Or at 582-83. It does not follow, however, that in adding the fourth question the legislature intended to *foreclose* the jury from considering *nonmitigating* evidence that another statute makes relevant to the sentencing decision. To the contrary, in explaining to the Senate Judiciary Committee how the fourth question would work, the witness who described it in essentially the form in which it was adopted said that it would allow "all kinds of arguments by the state * * * for * * * death[,] whether or not" relevant to the other three questions. In other words, the legislative history also

shows that the legislature contemplated an open-ended, not one-sided, consideration of the defendant's character, background, and circumstances of the crime. Finally, the legislative history as a whole suggests that the legislature intended to add the minimum protection for defendants that the federal constitution requires.

In conclusion, ORS 163.150 (1989) did not preclude the sentencing jury from considering evidence that ORS 137.013 specifies is relevant. Indeed, even in the terms of ORS 163.150(1)(b)(D), "victim impact" evidence was *independently relevant*. "Victim impact" evidence provides the jury with relevant evidence about the circumstances of the crime. It informs the jury of the reasonably foreseeable harm to the victim's family that the defendant's crime caused. *See Payne*, 501 US at 838 (Souter, J., concurring) (so stating). Moreover, such evidence makes real the abstract proposition that a murder ends a particular, unique person's life and affects that person's family. Thus, the loss that the crime causes is one of the circumstances of the crime and is relevant to the reasoned moral decision that the fourth question asks the jury to make. *See Penry*, 492 US at 319 (jury must give reasoned moral response to the defendant's background, character, and crime).

Even if there were some tension between the two statutes, ORS 137.013 is more specific than ORS 163.150 (1989) and, therefore, controls. This court already has held that another provision of Ballot Measure 10 is more specific than the general principles of relevance that otherwise would apply. *See Williams*, 313 Or at 28 (ORS 41.415, which was enacted as Oregon Laws 1987, chapter 2, section 8, specifically declares photographs of the victim while alive to be relevant and not subject to balancing under OEC 403).

Defendant's subconstitutional arguments are not well taken. Accordingly, I turn to his constitutional arguments.

## CONSTITUTIONAL ARGUMENTS

A. *State Constitution.*

Defendant preserved only one specific state constitutional argument. He asserted at trial, and asserts in conclusory fashion here, that the introduction of victim impact

evidence violated his right to an impartial jury under Article I, section 11, of the Oregon Constitution.[3]

That clause of Article I, section 11, governs the composition of the jury panel. *See State v. Busby*, 315 Or 292, 300 n 7, 844 P2d 897 (1993) (this court, in rejecting argument that evidence admitted at trial violated the defendant's right to an impartial jury, stated: "Defendant does not * * * argue that the jury *impaneled* for his own trial was influenced * * * by the evidence of his prior conviction, because that evidence was never placed before the jury." (emphasis added)). The impartial jury clause of Article I, section 11, does not govern what type of evidence that an impartial jury, once empaneled, may hear or consider.

In this court, defendant asserts that the challenged evidence offends Article I, section 11, as well as the Fourteenth Amendment, because it "was fundamentally unfair and seriously compromised his right to a fair trial." But, this court "repeatedly has stated that Oregon's constitution does not contain a due process clause." *State v. Moen*, 309 Or 45, 98, 786 P2d 111 (1990).

B. *Federal Constitution.*

1. *Eighth Amendment.*

Defendant argues that "[a]llowing evidence of the type challenged her[e] would produce wanton and freakish imposition of the death penalty in contravention of the Eighth Amendment."[4] The Supreme Court of the United States held in *Payne*, however, that the Eighth Amendment does not preclude states from allowing evidence concerning the victim and the effect of the victim's death on his or her immediate family. 501 US at 827.

The Supreme Court also has held that a state avoids the Eighth Amendment's prohibition against arbitrary imposition of the death penalty if it genuinely narrows the class of

---

[3] Article I, section 11, of the Oregon Constitution, provides in part:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *."

[4] The Eighth Amendment to the United States Constitution provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

murders for which the death penalty may be imposed. *Zant v. Stephens*, 462 US 862, 877, 103 S Ct 2733, 77 L Ed 2d 235 (1983). After that occurs, the Eighth Amendment does not bar the introduction of evidence that is relevant to the jury's sentencing decision. 462 US at 886-87. The Oregon statute genuinely narrows the class of murders for which the death penalty may be imposed, a determination that the jury makes at the guilt phase of the trial. *State v. Farrar*, 309 Or 132, 184-85, 786 P2d 161, *cert den* 498 US 879 (1990). Accordingly, the Eighth Amendment does not bar the introduction of relevant evidence, including the kind of evidence permitted by *Payne* and specifically authorized by ORS 137.013, during the penalty phase.

### 2. *Fourteenth Amendment.*

Defendant reiterates the conclusory argument made under the Oregon Constitution, that admission of this evidence was fundamentally unfair, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[5] In death penalty cases, the Due Process Clause is coextensive with the Eighth Amendment. *Moen*, 309 Or at 98. Because the Eighth Amendment does not preclude the victim impact evidence in this case, neither does the Due Process Clause.

### CONCLUSION

The victim impact evidence challenged in the present case is relevant under the mandate of ORS 137.013. Its admission is not precluded by ORS 163.150 (1989) or by the constitutional provisions that defendant cited to the trial court.

For the foregoing reasons, I dissent from the majority's contrary conclusion.

Carson, C. J., and Gillette, J., join in this dissenting opinion.

---

[5] The Fourteenth Amendment to the United States Constitution provides in part:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law * * *."